In re the Petition of S.O.,
Petitioner–Appellee,

For the Adoption of a Child E.E.F.,

and Concerning D.J.T.,
Respondent–Appellant.

No. 89SA449.

Supreme Court of Colorado,
En Banc.

July 16, 1990.

Marshall Quiat, Denver, for petitioner-appellee.

Joan S. Brett, Edwards, Terrill, Brett & Ridgway, Boulder, for respondent-appellant.

Justice MULLARKEY delivered the Opinion of the Court.

This is an appeal of a judgment of the Denver Juvenile Court denying a natural father's motion to set aside a stepparent adoption of his son by the husband of the child's mother.[1] The appellant sought to set aside this stepparent adoption on the basis that his consent authorizing the adoption of his child was invalid because it was induced by an unenforceable promise that he could continue to have visitation rights with respect to his child. The juvenile court declined to set aside the adoption, ruling that appellant's consent to the adoption of his child was knowingly, intelligently, and voluntarily given. We affirm the judgment of the juvenile court.

## I.

Appellant D.J.T. began living with T.O. in 1980 and lived with her for about five years. The two were unmarried during their entire relationship. On June 13, 1983, T.O. gave birth to a son, E.E.F., who is the subject of this dispute. T.O. conceded in an affidavit filed in the subsequent adoption action that D.J.T. was E.E.F.'s natural father.[2] Following E.E.F.'s birth, D.J.T. and T.O. continued to live together with their son for about two and one-half years. During that period, D.J.T. exercised at least some of the duties and responsibilities

---

1. The appellees in their briefs now question whether the appellant properly brought this action under C.R.C.P. 60(b). Because this argument was not raised below, it is properly raised here only if the argument goes to the juvenile court's jurisdiction to hear the matter. C.R.C.P. 60(b)(3) (motion to set aside judgment as void) only requires that the motion be brought within a reasonable time. Here, D.J.T. acted within a reasonable time after he was denied visitation. His action also was timely under section 19–5–214, 8B C.R.S. (1989 Supp.), which requires an action challenging a final decree of adoption because of a jurisdictional or procedural defect to be brought within two years.

2. T.O. and S.O. now assert in their brief that "[w]ithout establishing paternity as provided by law, the father of a child born out of wedlock is without legal relationships to the child...." However, the appellees neither disputed D.J.T.'s paternity below nor challenged his standing to bring suit. On the contrary, they specifically acknowledged in the adoption hearing that D.J.T. was E.E.F.'s natural father and that he had consented to the adoption. Under well-established principles of appellate procedure, the appellees will not now be heard to challenge for the first time on appeal D.J.T.'s status as the natural father of E.E.F.

of a father, although the exact extent to which he did so was disputed by the parties. In the Fall of 1985, T.O. ended her relationship with D.J.T. and, together with E.E.F., ceased to live with him. On October 18, 1985, T.O. married S.O., the appellee stepfather. Following T.O.'s marriage to S.O., D.J.T. continued to maintain a relationship with E.E.F., visiting him periodically in T.O. and S.O.'s home. D.J.T. did not contribute significantly to the costs of E.E.F.'s support, and was not asked to do so by T.O.[3]

In the Fall of 1986, T.O. approached D.J.T. to discuss the possibility that her husband S.O. adopt E.E.F. Among other reasons, according to D.J.T., T.O. and S.O. believed it would be better for the child to have S.O.'s last name and be eligible for his medical coverage.[4] The evidence presented at the juvenile court hearing on the appellant's motion to set aside the adoption indicated that the parties understood that D.J.T. would continue to visit E.E.F. after the adoption. The parties dispute, however, whether such visitation was to be as a matter of right for D.J.T. or only so long as T.O. and S.O. consented to such visits. It is undisputed that when T.O. and S.O. obtained a consent form from the juvenile court, they and D.J.T. brought the form to the office of the clerk of the court and asked a clerk whether they could modify the consent form to include a provision recognizing D.J.T.'s right to visit E.E.F. The clerk indicated "there wasn't any way to change the wording." D.J.T. signed the unaltered form.

On October 23, 1986, T.O. and S.O. filed a Petition for Adoption of a Child in Denver Juvenile Court. Included with the petition were D.J.T.'s and T.O.'s separate consents to the adoption. D.J.T.'s consent included a provision under which D.J.T. waived his right to notice of the adoption hearing. D.J.T. received no formal notice

of the hearing and D.J.T. testified without contradiction that he was not otherwise informed of the date and time of the hearing. On November 24, 1986, the juvenile court commissioner conducted a hearing on the stepfather's petition to adopt E.E.F., which D.J.T. did not attend. T.O. and S.O. appeared at the hearing without counsel and were questioned by the commissioner on whether they obtained the consent of the child's natural father. They assured the court that the father understood that the adoption decree would terminate his relationship with E.E.F. The commissioner determined that E.E.F. was available for adoption and that it "would serve the best interests of all of the parties" to enter an immediate final decree of adoption.

Following the adoption, D.J.T. continued to visit E.E.F. although over time T.O. became increasingly reluctant to permit the visits. Finally, in May of 1987, the appellees ceased permitting D.J.T. to visit the child and in August of 1987, they obtained a permanent injunction forbidding D.J.T. from contacting E.E.F.[5] About one month after the appellees ceased permitting D.J.T. to visit E.E.F., D.J.T. contacted an attorney and petitioned the juvenile court for a good cause hearing to obtain access to the adoption file. On January 28, 1988, D.J.T. filed in juvenile court what was designated a "Verified Motion to Set Aside Adoption Decree." On October 20, 1988, the court held a hearing on D.J.T.'s motion, receiving testimony from D.J.T., S.O. and T.O., and reviewed the file in the prior adoption action. The court denied the motion to set aside the adoption decree, finding that the father's consent to the adoption was "knowingly and intelligently and voluntarily executed." D.J.T. appealed that decision to the court of appeals, and this case was transferred to this court pursuant to section 13-4-110(1)(a), 6A C.R.S. (1987) be-

---

3. D.J.T. testified that he visited E.E.F. three times per week, occasionally taking E.E.F. over to his parents' house, and that he bought the child clothes. S.O. disputed some of this testimony; the trial court did not make a specific finding on this issue.

4. E.E.F., prior to his adoption, bore the family name of his mother and not the name of his natural father, D.J.T.

5. The record before us does not include the record of the injunction proceeding although the fact that an injunction was entered is not disputed.

cause D.J.T. raised certain questions regarding the constitutionality of the relevant statutes governing stepparent adoptions.

D.J.T. argues that section 19–5–203(1)(f), 8B C.R.S. (1989 Supp.),[6] violates principles of due process by permitting the adoption of a child, born out of wedlock, by a stepparent with the consent of only one of the parents and does not provide the other parent with notice or opportunity to be heard, regardless of the child's substantial relationship with the other parent. D.J.T. argues that this section also violates principles of equal protection because a stepparent adoption of a child whose parents were married but then divorced is permitted only with the consent of both parents. § 19–5–203(1)(e), 8B C.R.S. (1989 Supp.). Finally, D.J.T. argues that even if these statutes are interpreted to avoid constitutional difficulty by requiring consent, notice, and an opportunity to be heard prior to the termination of the parental rights of an unwed parent, the adoption of E.E.F. must be set aside because S.O. and T.O. did not obtain his valid consent and because he received no notice of the adoption hearing. While conceding that he signed a form consenting to the adoption, D.J.T. argues that his consent was given under a mutual mistake of law and fact, namely that it could be conditioned on his continued right to visit E.E.F.

We find that under our statutory scheme, as applied to these facts, the adoption of E.E.F. could not proceed without the consent of his natural father. However, we hold that the juvenile court properly found that D.J.T. validly consented to the adoption. Further, we hold that, although D.J.T. was entitled to notice of the adoption hearing and an opportunity to be heard, D.J.T. waived this right.

## II.

■■■ Before specifically addressing D.J.T.'s arguments, it is useful to review the statutory scheme governing stepparent adoptions. In *E.R.S. v. O.D.A.*, 779 P.2d 844 (Colo.1989), and in *In re Petition of R.H.N.*, 710 P.2d 482 (Colo.1985), we considered the procedures which the legislature established for the adoption of a child by a stepparent. Adoption in Colorado is a creature of statutory law and is governed by the provisions set out in sections 19–5–201 to –215, 8B C.R.S. (1989 Supp.). The adoption of a child by a stepparent necessarily terminates the parental rights of the noncustodial parent. *E.R.S.*, 779 P.2d at 847; *R.H.N.*, 710 P.2d at 485. To commence a proceeding for a stepparent adoption, the stepparent files an adoption petition pursuant to section 19–5–208, 8B C.R.S. (1989 Supp.). *Id.* The court must decide whether the child is "available for adoption" pursuant to section 19–5–203, 8B C.R.S. (1989 Supp.). Subsection (1) of that section provides in relevant part:

(1) A child may be available for adoption only upon:

(a) Order of the court terminating the parent-child legal relationship in a proceeding brought under article 3 or 5 of this title;

(b) Order of the court decreeing the voluntary relinquishment of the parent-child legal relationship under section 19–5–103 or 19–5–105;

(c) Written and verified consent of the guardian of the person, appointed by the court, of a child whose parents are deceased;

(d)(I) Written and verified consent of the parent in a stepparent adoption where the other parent is deceased or his parent-child legal relationship has been terminated under paragraph (a) or (b) of this subsection (1);

(II) Written and verified consent of the parent in a stepparent adoption where the other parent has abandoned the child

---

**6.** At the time this case was heard in the trial court, the adoption provisions were codified at sections 19–4–105 to –116, 8B C.R.S. (1986). In 1987, these sections were repealed and reenacted, and relocated to their present position in the statutes. Although there were some modifications in these provisions in 1987, those modifications are not relevant to the discussion before us. In considering D.J.T.'s challenge to our adoption provisions, we utilize the present statutory designations.

for a period of one year or more or where he has failed without cause to provide reasonable support for such child for a period of one year or more. Upon filing of the petition in adoption, the court shall issue a notice directed to the other parent, which notice shall state the nature of the relief sought, the names of the petitioner and the child, and the time and place set for hearing on the petition. If the address of the other parent is known, service of such notice shall be in the manner provided by the Colorado rules of civil procedure for service of process. Upon affidavit by the petitioner that, after diligent search, the address of the other parent remains unknown, the court shall order service upon the other parent by one publication of the notice in a newspaper of general circulation in the county in which the hearing is to be held. The hearing shall not be held sooner than thirty days after service of the notice is complete, and, at such time, the court may enter a final decree of adoption notwithstanding the time limitation in section 19–5–210(2).

(e) Written and verified consent of the parent having only residual parental rights and responsibilities when custody has been awarded to the other parent in a dissolution of marriage proceeding where the spouse of the parent having custody wishes to adopt the child;

(f) Written and verified consent of the parent or parents as defined in section 19–1–103(21) in a stepparent adoption where the child is conceived and born out of wedlock[.]

Here, there was no independent proceeding terminating D.J.T.'s parental rights. Further, unlike *E.R.S.* or *R.H.N.*, the adoption proceeding did not go forward on the basis that D.J.T. had abandoned E.E.F. but rather on the basis that D.J.T. had consented to E.E.F.'s adoption. Thus, the propriety of E.E.F.'s adoption must be considered under section 19–5–203(1)(f), the only subsection by its terms applying to the circumstances of the present case.

Because the statute provides that a child conceived and born out of wedlock is available for adoption with the written and verified consent of the parent *or* parents,[7] D.J.T. argues that this section unconstitutionally permits the adoption of the child of unwed parents with the consent of only one of the parents. However, we reject D.J. T.'s interpretation of section 19–5–203(1)(f), and hold that the adoption of E.E.F. was only proper with the valid consent of D.J.T. Thus, we need not address D.J.T.'s constitutional arguments.[8]

▮ In interpreting a statute, we seek to discern the intent of the legislature. *People v. Guenther*, 740 P.2d 971 (Colo. 1987). We presume that the legislature intends a just and reasonable result when it enacts a statute and we seek to avoid an interpretation leading to an absurd result. *Ingram v. Cooper*, 698 P.2d 1314 (Colo. 1985). We must choose a construction of the statute which best effectuates the purposes of the legislative scheme. *Smith v. Myron Stratton Home*, 676 P.2d 1196 (Colo.1984). If possible, we must adopt a constitutional construction of a statute. § 2–4–201(1)(a), 1B C.R.S. (1980), *People v. Schwartz*, 678 P.2d 1000 (1984).

---

7. Section 19–1–103(21), 8B C.R.S. (1989 Supp.), provides that a parent means either a natural parent of a child, as may be established under the Uniform Parentage Act, sections 19–4–101 to –129, 8B C.R.S. (1989 Supp.), or an adopted parent. Relevant here, section 19–4–105(1)(d) presumes a man to be the parent of a child if "[w]hile the child is under the age of majority, he receives the child into his home and openly holds out the child as his natural child." Here, the appellees did not challenge D.J.T.'s parental status.

8. In *Stjernholm v. Mazaheri*, 180 Colo. 352, 506 P.2d 155 (1973), we rejected the constitutional

challenge of a natural father to a stepparent adoption under section 22–4–7(1), C.R.S. (1963) (1969 Perm.Supp.), now codified at section 19–5–203(1)(d)(II), 8B C.R.S. (1989 Supp.). The father in *Stjernholm*, who had divorced the child's natural mother, apparently argued that principles of due process required his consent prior to the adoption of his child. The court, in rejecting his argument, found that the father's nonsupport of his child could provide a basis for the adoption without his consent. As noted above, the adoption in this case did not proceed under the theory that the natural father had abandoned E.E.F.

■ In *E.R.S.* this court held that "[p]arents who protest the adoption of their children must be provided with 'fundamentally fair procedures' because natural parents have 'a fundamental liberty interest in the companionship, care, custody and management of their child.' " *E.R.S.*, 779 P.2d at 847, *quoting R.H.N.*, 710 P.2d at 487. Thus, in interpreting these provisions we presume that the legislature acted with proper regard for parents' fundamental interest in securing their relationship with their children. The plain language of section 19–5–203(1)(f) leads us to reject D.J.T.'s suggested construction of the statute. By phrasing the consent requirement for the adoption of children of unwed parents in the disjunctive "or," the legislature must have contemplated that in certain circumstances the consent of a single unwed parent would suffice whereas, in other circumstances, the consent of both parents should be required to permit the adoption of their child. A contrary interpretation would render the word "parents" completely superfluous, contrary to well-established principles of statutory interpretation, because the consent of a single "parent" would in every instance establish that a child is available for adoption. We believe that a more natural interpretation of the statute is that the consent of only one parent is sufficient when the other parent is deceased or the identity or whereabouts of the other parent is not known and not ascertainable by due diligence. This interpretation of section 19–5–203(1)(f) will protect the liberty interest of unwed parents in their relationship with their children. If both unwed parents are known and either is unwilling to consent, then the adoption proceeding may not go forward on the basis of subsection (1)(f). We hold that a child is not "available for adoption" under section 19–5–203(1)(f) without the consent of both natural parents when both parents are living and the identity and whereabouts of both parents are known or ascertainable by due diligence.

■ Because there is no dispute that D.J.T.'s identity and location were known in this case, the adoption of E.E.F. was only proper if D.J.T. validly consented to E.E.F.'s adoption. D.J.T. claims that although he consented to the adoption of E.E.F., his consent was conditioned upon his retaining the right to visit E.E.F. Because such right is unenforceable, D.J.T. argues, his consent must be invalidated. Further, D.J.T. argues that even if his consent to the adoption was valid, E.E.F.'s adoption must be set aside because he was not notified of the time and place of the adoption hearing.[9] We disagree.

There is no dispute that D.J.T. accompanied S.O. and T.O. to visit the juvenile court in order to obtain information on the procedures for the adoption of E.E.F. Although they inquired of a clerk at the court whether it was possible to alter the standard adoption consent form to include terms granting D.J.T. visitation rights, D.J.T. proceeded to sign the unaltered consent form when he was told that form could not be altered. That form stated in relevant part:

> I hereby consent to the adoption of said child by the petitioners in proceedings for such adoption which have been, or will hereafter be instituted in the Juvenile Court of Denver, Colorado, which adoption shall be subject to the approval and direction of the Judge of said Court.

> Believing it to be for the best interest of said child, I do hereby give my consent freely and voluntarily to said adoption, and relinquish all my rights and claim to said child, and agree that from the date of the decree of adoption said child shall, to all legal intents and purposes, be the child of the person or persons so adopting said child.

> I hereby waive any and all notice and notices required by law in connection with these proceedings and consent to the hearing of petition for the adoption

9. Although section 19–5–203(1)(f) does not specifically require that an unwed parent in the circumstances of D.J.T. be given notice and an opportunity to be heard at the adoption hearing, we have held previously that a parent's liberty interest in his relationship with his child may not be adversely affected in a judicial proceeding unless the parent is provided with notice and an opportunity to be heard. *Hamman v. County Court*, 753 P.2d 743, 748 (Colo.1988).

of said child and the entry of final decree of adoption herein.

The juvenile court found that D.J.T.'s consent to the adoption of E.E.F. was "knowingly and intelligently and voluntarily" executed. Although the court did not explicitly determine that D.J.T. had knowingly and intelligently waived the right to notice in the adoption hearing, implicitly the court's finding on the validity of the consent to the adoption applied equally with respect to the validity of the waiver of notice. There is sufficient evidence in the record to support the juvenile court's finding that the consent to the adoption, and thus the waiver, was valid. First, we note that the consent/waiver form was written in plain language, clear and unambiguous on its face. D.J.T. consented to the relinquishment of "all my rights and claim to said child," and agreed that the child would "to all legal intents and purposes, be the child of the person or persons so adopting said child." Further, D.J.T. in his testimony conceded that he was told by a court official that the consent form could not be changed to make the adoption conditional so as to grant him visitation rights. Also, T.O. testified that D.J.T. understood completely that his visitation rights would terminate under the agreement and that he would only be permitted to visit E.E.F. with S.O.'s and T.O.'s permission and that such permission would be granted only so long as D.J.T. did not use illegal drugs. Although there was conflicting evidence on this point, the juvenile court was free to reject D.J.T.'s claim that he signed the consent/waiver form only because he did not realize it would terminate his parental rights vis-a-vis E.E.F.[10]

■ Because D.J.T. validly consented to the adoption of E.E.F. by S.O., there was no basis upon which to grant his motion to set aside the adoption. A parent's change of heart or subsequent regret at having consented to the adoption of his child is not by itself a sufficient reason for setting aside the adoption. *B.B. v. S.S.*, 171 Colo. 534, 468 P.2d 859 (1970). Thus, because the juvenile court properly denied D.J.T.'s motion to set aside the adoption, the judgment of that court is affirmed.

Judgment affirmed.

QUINN, J., dissents, and ROVIRA, C.J., and ERICKSON, J., join in the dissent.

Justice QUINN dissenting:

I dissent from the court's upholding the natural father's consent to the adoption as knowing, intelligent, and voluntary, when, as here, there is substantial evidence in the record of the natural father's mistaken belief that he would be entitled to exercise continued visitation with his child after the entry of a final decree of adoption.

Because a natural parent has a constitutionally protected liberty interest in the parent-child relationship, *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), a natural parent's consent to an adoption must be knowingly, intelligently, and voluntarily made. A consent is knowing and intelligent when the natural parent is aware of the import and consequences of an adoption decree to which the consent is directed—that is, that the effect of the adoption decree will be to divest the natural parent "of all legal rights and obligations with respect to the child." § 19–5–211(2), 8B C.R.S. (1989 Supp.). *See, e.g., People in the Interest of J.B.P.*, 44 Colo.App. 95, 608 P.2d 847 (1980); *K.W.E. v. People*, 31 Colo.App. 219, 500 P.2d 167 (1972). A consent is voluntary when it is the product of a free and uncon-

---

**10.** We question whether a parent, having executed a valid consent authorizing the adoption of his child, is in any event entitled to notice and an opportunity to be heard at the adoption hearing. Obviously, the purpose of notice and an opportunity to be heard is so that the parent might raise objections to the adoption of the child. Having consented to such adoption, presumably there is no longer any reason to notify the parent in advance of the legal proceedings intended to act upon such consent. *See Smith v. Welfare Dept.*, 144 Colo. 103, 355 P.2d 317 (1960) (parents having validly relinquished child had no right to object to lack of notice of subsequent adoption hearing); *see also Matter of Andersen*, 99 Idaho 805, 589 P.2d 957 (1978), *overruled on other grounds, Petition of Steve B.D.*, 111 Idaho 285, 723 P.2d 829 (1986) (valid unrevoked consent to adoption negates requirement of notice and opportunity to be heard).

strained choice of the maker. A consent induced by a promise or representation that the natural parent will retain the legal right of visitation after the entry of the adoption decree, when in fact the natural parent will be divested of such right, obviously does not qualify as a voluntary consent.

The evidence in this case demonstrates that the natural father, D.J.T., executed the consent form on the basis of the representation by the adopting parent, S.O., and T.O., the natural mother and S.O.'s wife, that D.J.T. would be permitted to exercise continued visitation with the child subsequent to the adoption. During the hearing on D.J.T.'s motion to vacate the adoption decree, S.O. admitted that he had assured D.J.T. that he would be permitted to continue his visitation with the child subsequent to the adoption decree. Notwithstanding that representation, S.O., at the hearing on his petition to adopt the child, never informed the juvenile court commissioner of his representation to D.J.T. In similar fashion, the natural mother, when asked by the commissioner during the adoption hearing whether D.J.T. understood that his right of visitation would be terminated by the decree, replied, "Right." Because D.J.T. was never provided with notice of the adoption hearing, he never had the opportunity to inform the commissioner that his consent was based on his understanding that he would retain his legal right of visitation and was executed in reliance upon the joint representation of S.O. and T.O. that the adoption decree would not terminate that right.

I would resolve this case by adopting the reasoning of the Pennsylvania Supreme Court in *In re Adoption of Singer*, 457 Pa. 518, 326 A.2d 275 (1974), a case factually similar to the instant controversy. In *Singer*, the natural father and natural mother, Frederick and Shirley Singer, were divorced in New Jersey, and custody of their minor daughter was awarded to the mother. Upon the mother's remarriage to Thomas Forbes, the natural father executed an agreement modifying the earlier separation agreement to provide that he would consent to the adoption of his daughter by Forbes and that his visitation rights would continue. The Forbes thereafter filed a petition for adoption in Pennsylvania, and the trial court denied the petition because the natural father's consent was not unconditional. The Forbes then obtained the natural father's signature to an unconditional form of consent and, relying upon that document, again petitioned the Pennsylvania court for a decree of adoption, and the trial court entered an adoption decree. Approximately six months later the natural father filed a petition to open the decree on the basis that he had received no notice of the adoption hearing and that his signature had been obtained by deception. At the hearing to open the adoption decree, the natural father testified that Thomas Forbes told him that the judge had been informed of all the conditions that were involved in the adoption and that the new consent form had the same meaning as the one previously executed by the natural father. The trial court concluded that there was a mutual mistake of fact and law between the parties as to the legal effect and consequences of the adoption decree and ordered that the decree be opened. The Pennsylvania Supreme Court affirmed, reasoning as follows:

> A decree of adoption here would terminate forever all relations between [the daughter] and her natural father. For all purposes, legal and practical, she would be dead to [the natural father] and he would lose his right ever to see her again or ever to know of her whereabouts.... The [natural] father simply did not consent to such an adoption. The record clearly indicates that from the time that he first agreed to an adoption in the amendment of the New Jersey divorce decree, [the natural father] never intended to give up his parental rights. Although his signature did appear on the unconditional consent form, it was nevertheless conditioned upon the retention of these rights.

> \* \* \* \* \* \*

> The problem is that the preservation of these rights, even through an informal agreement, or on a goodwill basis, con-

flicts with the incident of complete control and custody of an adopted child by an adopting parent as contemplated by law. We cannot say that a consent conditioned upon the preservation of certain rights with respect to the child is sufficient to effectively establish the statutorily required consent. The severance of natural ties occasioned by adoption is of such obvious finality as to demand clear and unequivocal consent by a natural parent and we believe that [the natural father's] consent here was insufficient. 457 Pa. at 524, 326 A.2d at 278; *see also* *McCormick v. State*, 218 Neb. 338, 354 N.W.2d 160 (1984) (relinquishment for adoption not voluntary and hence invalid where natural parents were told that they had a chance to see their son through an "open adoption"—an adoption in which the natural parents continue to have contact with the child—if they signed a relinquishment, and natural parents executed their relinquishment on that representation); *McLaughlin v. Strickland*, 279 S.C. 513, 309 S.E.2d 787 (S.C.App.1983) (natural father's execution of a consent to adoption was not valid where the consent was qualified by father's intent to retain parental visitation with child).

Given the state of the record in this case, the juvenile court's determination that D.J. T.'s consent was knowingly, intelligently, and voluntarily made is manifestly contrary to the evidence and should be reversed. I accordingly would reverse the judgment of the Denver Juvenile Court and remand the matter to that court with directions to set aside the decree of adoption on the basis that the natural father's consent was not knowingly, intelligently, and voluntarily made.

I am authorized to say that Chief Justice ROVIRA and Justice ERICKSON join in this dissent.