Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
April 30, 2018

**2018 CO 34**

**No. 16SC287, People in Interest of L.M.—Children's Code—Dependency and Neglect—Relinquishment—Termination of Parental Rights—§ 19-3-602, C.R.S. (2017)—§ 19-5-105, C.R.S. (2017)**

This case requires the supreme court to determine whether the State may seek to terminate a parent's parental rights under the relinquishment provision of the Colorado Children's Code, § 19-5-105, C.R.S. (2017), when the child is already subject to a dependency and neglect proceeding under Article 3 of the Code, §§ 19-3-100.5 to -805, C.R.S. (2017).

The court concludes that when a dependency and neglect proceeding is pending, the State can terminate parental rights only through the procedures set forth in Article 3 of the Code and cannot use the more limited processes provided in Article 5.

Accordingly, the court affirms the court of appeals division's judgment.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

---

## 2018 CO 34

---

### Supreme Court Case No. 16SC287
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case Nos. 14CA2454, 14CA2455, 14CA2456, & 14CA2457

---

**Petitioner:**
The People of the State of Colorado
**In the Interest of Minor Children:**

L.M., E.M., and E.J.M.,

**and Concerning**

**Respondent:**

L.G.M.

---

### Judgment Affirmed
*en banc*
April 30, 2018

---

**Attorney for Petitioner:**
Jason T. Kelly
  *Alamosa, Colorado*


**Guardian ad Litem for the Minor Children:**
Anna N. H. Ulrich, Attorney at Law, L.L.C.
Anna N. H. Ulrich
  *Salida, Colorado*


**Attorneys for Respondent:**
Zerbi Law Firm, PC
Mérida I. Zerbi
  *Monte Vista, Colorado*


**JUSTICE GABRIEL** delivered the Opinion of the Court.

**JUSTICE BOATRIGHT** dissents, and **JUSTICE COATS** joins in the dissent.

¶1 This case requires us to decide whether the State may seek to terminate a parent's parental rights under the relinquishment provision of the Colorado Children's Code (the "Code"), § 19-5-105, C.R.S. (2017), when the child is already subject to a dependency and neglect proceeding under Article 3 of the Code, §§ 19-3-100.5 to -805, C.R.S. (2017).[1] We conclude that when a dependency and neglect proceeding is pending, the State can terminate parental rights only through the procedures set forth in Article 3 of the Code and cannot use the more limited processes provided in Article 5.

¶2 Accordingly, we affirm the court of appeals division's judgment.

## I. Facts and Procedural Background

¶3 The Alamosa County Department of Human Services (the "Department") received a call from a "concerned party" who reported that the mother of the children at issue ("Mother") had given birth to a child, E.J.M., and that during prenatal visits Mother had tested positive for opiates. The Department also received the results of a meconium drug screen, performed after E.J.M.'s birth, which indicated the presence of opiates, oxycodone, and oxymorphone. And the Department received an additional report that Mother had been seen selling pills out of her home in the presence of her children and that her infant "appeared to be going through withdrawals."

---

[1] Specifically, we granted certiorari to review the following issue:

> Whether a juvenile court must proceed under section 19-5-105, C.R.S. (2015), or section 19-3-604, C.R.S. (2015), when terminating the parent-child legal relationship of the non-relinquishing parent after one parent decides to relinquish his or her parental rights to a child subject to dependency and neglect proceedings.

¶4 The Department interviewed Mother, who admitted that she was addicted to prescription medications, although she denied selling drugs from her home. Mother had a history of prior referrals to the Department, and her older children had previously been temporarily removed from her home due to her drug use.

¶5 Meanwhile, the father of the children, respondent L.G.M. ("Father"), had been incarcerated following a criminal conviction and remained in custody at the time the Department conducted its investigation. Father had a history of methamphetamine use.

¶6 In light of the foregoing, the Department filed a dependency and neglect petition with regard to E.M., L.M., and E.J.M. (the "Children"). Although both Mother and Father initially denied the allegations contained in the petition, they subsequently entered admissions, and the court adjudicated the Children dependent and neglected.

¶7 The court then conducted a dispositional hearing and adopted a treatment plan for Mother. After discussions with Father (who appeared pro se, having dismissed his appointed counsel), however, the court found that no treatment plan could be developed for Father at that time. The court based this finding on Father's non-responsive answers to the court's questions, which the court construed as an objection to the proposed treatment plan. Nonetheless, the court informed Father that if at any point, he decided that he was ready to work on a treatment plan, then he could ask and the court would have the Department prepare one for him. But the court warned Father that there could come a time when it would be too late for him to make such a request.

¶8     A few months later, the case came before a new judge for a permanency planning hearing. During that hearing, the court informed Father that the permanency plan for the children remained reunification with the parents and stated that the court would allow the Department to continue to work with Father's prison case manager to see if Father could take advantage of whatever programs the prison had available.

¶9     Ultimately, the guardian ad litem filed a motion to terminate both parents' legal rights. Mother chose not to contest this motion and subsequently relinquished her rights. Once Mother did so, the Department filed its own petition, pursuant to the relinquishment provisions in Article 5 of the Code, to terminate Father's parental rights. Father continued to indicate his desire for reunification with the Children and some willingness to participate in treatment. Nevertheless, the matter proceeded to a hearing in accordance with the Article 5 relinquishment provisions. After hearing testimony from the Children's therapist, Father, and Father's mother, the juvenile court terminated Father's parental rights pursuant to Article 5 (the relinquishment provisions) of the Code and made the Children available for adoption.

¶10    Father appealed, and in a unanimous, published decision, a division of the court of appeals reversed. People ex rel. E.M., 2016 COA 38M, ¶ 7, ___ P.3d ___. In its opinion, the division concluded that Article 3 and Article 5 of the Code serve distinct purposes and that "these separate and distinct purposes are not well served when an attempt is made to intertwine them." Id. at ¶ 10. The division characterized Article 3's purpose as the protection of children and the preservation of family ties, if possible. Id.

at ¶ 11.  The division described Article 5, in contrast, as designed "to promote the integrity and finality of adoption to ensure that children whose parents are unable or unwilling to provide proper parental care will be raised in stable, loving, and permanent families."  Id. at ¶ 13.  The division further concluded that "the dependency and neglect court maintains continuing, exclusive jurisdiction over any child who has been adjudicated dependent and neglected."  Id. at ¶ 18.  Therefore, it reasoned, "[T]he dependency and neglect case is that which controls the status of an alleged dependent and neglected child.  In sum, when a child is dependent and neglected, matters related to that child's status must be addressed through the open dependency and neglect case."  Id. at ¶ 24 (citation omitted).  The division thus reversed the termination under Article 5 and remanded for further proceedings in the dependency and neglect case.  Id. at ¶¶ 36–37.

¶11     The Department then filed a petition for certiorari, which we granted.

## II.  Analysis

¶12     We begin by discussing the standard of review and the applicable principles of statutory construction.  We then consider whether Article 3 and Article 5 of the Code conflict.  To this end, we review the differing purposes of Article 3 and Article 5.  We further examine the procedures set out in each section to effectuate those purposes and note that Article 5 implicitly presumes both that the relinquishing parent is fit and acting in the best interests of the relinquished child and that no dependency and neglect proceeding is ongoing.  We then consider the Department's and guardian ad litem's

5

arguments, ultimately finding them unpersuasive, and we conclude that in the circumstances presented here, Article 3 and Article 5 conflict and that the General Assembly did not intend to allow the State to circumvent the substantive and procedural protections available to the parties in a pending Article 3 proceeding. Accordingly, we conclude that the Department could not proceed with a termination motion under Article 5 in this case, and we remand for further proceedings in the dependency and neglect action.

## A. Standard of Review and Principles of Statutory Construction

¶13    We review questions of statutory interpretation de novo. UMB Bank, N.A. v. Landmark Towers Ass'n, 2017 CO 107, ¶ 22, 408 P.3d 836, 840. In construing a statute, we look at the entire statutory scheme "in order to give consistent, harmonious, and sensible effect to all of its parts, and we apply words and phrases in accordance with their plain and ordinary meanings." Id. In addition, "[w]e construe statutes related to the same subject matter alongside one another . . . , [and] [w]e strive to avoid statutory interpretations that render certain words or provisions superfluous or ineffective." Kinder Morgan CO2 Co. v. Montezuma Cty. Bd. of Comm'rs, 2017 CO 72, ¶ 24, 396 P.3d 657, 664 (citation omitted). We likewise avoid constructions that lead to absurd results. See In re S.O., 795 P.2d 254, 258 (Colo. 1990). Our goal is to adopt an interpretation that achieves consistency across a comprehensive statutory scheme. People ex rel. D.R.W., 91 P.3d 453, 457 (Colo. App. 2004).

6

## B.  Article 3 and Article 5 of the Code

¶14    The General Assembly has declared that the purposes of the Code generally include (1) securing for each child subject to the Code "such care and guidance, preferably in his own home, as will best serve his welfare and the interests of society"; (2) preserving and strengthening family ties whenever possible; (3) removing children from the custody of their parents only when their welfare and safety or the protection of the public would otherwise be endangered; and (4) securing for any child removed from his parents' custody "the necessary care, guidance, and discipline to assist him in becoming a responsible and productive member of society."  § 19-1-102(1), C.R.S. (2017). The Code thus "strives to preserve the family while simultaneously ensuring the child's best interest and welfare."  In re K.D., 139 P.3d 695, 698 (Colo. 2006).

¶15    Within the Code, as the division observed, Article 3 and Article 5 serve different purposes.

¶16    As pertinent here, Article 3 addresses the issue of dependent and neglected children.  See §§ 19-3-100.5 to -805.  The Article states in its legislative declaration that "the stability and preservation of the families of this state and the safety and protection of children are matters of statewide concern."  § 19-3-100.5(1).  To that end, the State must "make a commitment to make 'reasonable efforts' to prevent the placement of abused and neglected children out of the home and to reunify the family whenever appropriate."  Id.  The Code thus sets forth a number of procedures aimed at protecting children from emotional and physical harm while seeking to repair and maintain family

ties. L.L. v. People, 10 P.3d 1271, 1275 (Colo. 2000). Although "[t]ermination is an unfortunate but necessary remedy when all reasonable means of establishing a satisfactory parent-child relationship have been tried and found wanting," the provisions of Article 3 make clear that "[i]t is not a desired outcome for which the State should strive from the inception of a dependency or neglect proceeding." People ex rel. A.M.D., 648 P.2d 625, 640 (Colo. 1982).

¶17    The General Assembly designed Article 5, in contrast, "to promote the integrity and finality of adoptions to ensure that children placed in adoptive placements will be raised in stable, loving, and permanent families." § 19-5-100.2(2), C.R.S. (2017); accord In re D.S.L., 18 P.3d 856, 858 (Colo. App. 2001). To this end, the legislature adopted a number of provisions to ensure an expedited adoption process in cases arising under this Article. See, e.g., § 19-5-102.5, C.R.S. (2017) (providing that petitions for relinquishment shall be given priority on a court's docket); §§ 19-5-103.5, 19-5-103.7, C.R.S. (2017) (providing for expedited procedures when the child being relinquished is under one year of age at the time of the filing of the relinquishment petition); § 19-5-105 (requiring courts to set a hearing "as expeditiously as possible" to determine whether the interests of the child or of the community require that the non-relinquishing parent's rights shall be terminated); § 19-5-202.5, C.R.S. (2017) (requiring that courts give petitions for adoption priority on their dockets).

¶18    Commensurate with these differing goals, Article 3 and Article 5 establish different substantive and procedural mechanisms for terminating parental rights. We

8

next summarize and analyze these differences because they inform our conclusions in this case.

## 1. Terminations Under Article 3

¶19 Article 3 sets out a detailed process under which the State can intervene in a family, work to improve the conditions of that family, and if necessary, seek to terminate the legal relationship between the parents and any children.

¶20 Under Article 3, a dependency and neglect proceeding begins when a local county department of human services or a local law enforcement agency learns of suspected abuse or neglect. See § 19-3-501(1), C.R.S. (2017); accord A.M. v. A.C., 2013 CO 16, ¶ 11, 296 P.3d 1026, 1030. After taking immediate steps to protect the child, the department must notify a juvenile court of competent jurisdiction with respect to the child. § 19-3-312(1), C.R.S. (2017). The court then undertakes an investigation and thereafter may authorize the filing of a dependency and neglect petition. Id.; § 19-3-501(1)(b).

¶21 If the court authorizes such a filing, then the local county department of social services files a petition alleging that the child is dependent or neglected and setting forth the facts supporting that allegation. See § 19-3-502, C.R.S. (2017). Notably, only the State may file such a petition. See A.M., ¶ 12, 296 P.3d at 1030.

¶22 The matter then proceeds, and the parents either admit to all or some of the allegations in the petition or hold the State to its burden of proving the allegations by a preponderance of the evidence at an adjudicatory hearing at which the parents may call

9

and cross-examine witnesses. See id., ¶ 12, 296 P.3d at 1030–31; see also § 19-3-505, C.R.S. (2017) (governing adjudicatory hearings). If the State satisfies its burden (or if the parent admits the allegations), then the court will sustain the petition and enter an order of adjudication indicating whether the child is dependent or neglected. § 19-3-505(7)(a). "The adjudication represents the court's determination that state intervention is necessary to protect the child and that the family requires rehabilitative services in order to safely parent the child." A.M., ¶ 12, 296 P.3d at 1031.

¶23 If the court sustains the petition and adjudicates the child dependent or neglected, then the court convenes a dispositional hearing at which the court considers the disposition best serving the interests of the child and the public and enters a decree of disposition. §§ 19-3-505(7)(b), 19-3-507(1)(a).

¶24 When the decree does not terminate the parent-child legal relationship, the court must approve an appropriate treatment plan. § 19-3-508(1)(e).[2] The purpose of this plan is "to provide services to the family, to prevent unnecessary out-of-home placement of the child, and to facilitate reunification of the child and family." A.M., ¶ 14, 296 P.3d at 1031. In approving such a plan, the court strives "to preserve the parent-child relationship, whenever possible, by assisting the parent in overcoming

---

[2] Under certain, specified circumstances, however, a court may determine that it cannot devise an appropriate treatment plan as to a particular parent. See § 19-3-508(1)(e) ("[T]he court may find that an appropriate treatment plan cannot be devised as to a particular respondent because the child has been abandoned as set forth in section 19-3-604(1)(a) and the parents cannot be located, or because the child has been adjudicated as neglected or dependent based upon section 19-3-102(2), or due to the unfitness of the parents as set forth in section 19-3-604(1)(b).").

those problems which led to the dependency adjudication." People ex rel. M.M., 726 P.2d 1108, 1121 (Colo. 1986). An "appropriate treatment plan" is thus defined as a "a treatment plan approved by the court that is reasonably calculated to render the particular respondent fit to provide adequate parenting to the child within a reasonable time and that relates to the child's needs." § 19-1-103(10), C.R.S. (2017).

¶25 After the court adopts a treatment plan, it sets periodic reviews to monitor the family's progress. A.M., ¶ 14, 296 P.3d at 1031. Failure to comply reasonably with the treatment plan may provide a basis for the State or a guardian ad litem to file a motion to terminate parental rights. Id.

¶26 The termination process generally begins with the filing of a petition for termination, detailing the factual grounds for termination. See § 19-3-602(1), C.R.S. (2017). After such a petition is filed, the court must advise the parents that they have a right to counsel, if they are not already represented. § 19-3-602(2). If they are not represented, then the court will appoint counsel for them. Id. In addition, the court must appoint a guardian ad litem to represent the child's best interests. Id.

¶27 The matter then proceeds to a hearing, which must occur within strict time frames. See id. As pertinent to this case, after such a hearing, a court may order a termination of the parent-child legal relationship only if it finds, by clear and convincing evidence, that the child has been adjudicated dependent or neglected and (1) the parent has not reasonably complied with an appropriate treatment plan, the plan has been unsuccessful, or the court had previously found that an appropriate plan

11

could not be devised; (2) the parent is unfit; and (3) the parent's conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. (2017).

¶28 In short, as the above-described provisions demonstrate, parents who face possible termination of their parental rights in a dependency and neglect proceeding receive an array of substantive and procedural protections, which this court has summarized as follows:

> The criteria for termination must be proven by clear and convincing evidence. Parents are entitled to notice of the allegations supporting the motion to terminate, to have a hearing on the motion, and, at that hearing, to be assisted by legal counsel. If indigent, parents may request counsel at the expense of the State and may employ the services of an expert witness at the State's expense. At the termination hearing, the parents have the right to cross-examine adverse parties and call their own witnesses. Before terminating the parent-child relationship, the trial court must consider and eliminate less drastic alternatives, and the parents must be given the opportunity to rehabilitate through participation in the treatment plan. Finally, termination is impossible absent the preliminary determination that the child is dependent and neglected, and adjudication is contingent on strict adherence to numerous procedural safeguards.

A.M., ¶ 29, 296 P.3d at 1035 (citations omitted).

## 2. Terminations Under Article 5

¶29 Termination proceedings under Article 5 stand in sharp contrast to the above-described procedures set forth in Article 3, and in cases like the present one, we perceive the respective procedures to conflict. Article 5 establishes a streamlined and expedited process under which a parent's legal relationship with his or her child can be terminated. Specifically, under Article 5, the relinquishment process generally begins at the instance of a parent, not the State, and the State is not a party to the relinquishment

proceedings.  See People ex rel. T.D., 140 P.3d 205, 217 (Colo. App. 2006), abrogated in part on other grounds by People ex rel. A.J.L., 243 P.3d 244, 252 (Colo. 2010); see also § 19-5-103(1), C.R.S. (2017) (providing that any parent who wishes to relinquish his or her child must petition the court).  After obtaining whatever counseling for himself or herself and possibly the child that the court may have deemed appropriate, the parent files a petition on a standardized form indicating the names of both natural parents (if known), the name of the child (if named), the ages of all parties concerned, and the reasons for which relinquishment is desired.  § 19-5-103(1)(b)(I).  The parent must also file a standardized affidavit of relinquishment counseling containing certain prescribed information.  § 19-5-103(1)(b)(II).  Once the court receives these documents, it sets a hearing to consider the petition.  § 19-5-103(3).  At the conclusion of this hearing, the court shall enter an order of relinquishment if it finds that (1) the relinquishing parent and any child that the court directed into counseling have received the prescribed counseling; (2) the parent's decision to relinquish is knowing and voluntary and not the result of any threats, coercion, or undue influence or inducements; and (3) the relinquishment would best serve the interests of the child to be relinquished. § 19-5-103(7)(a).  Article 5 further directs that if one parent relinquishes or proposes to relinquish a child, the agency or person having custody of the child "shall file a petition in the juvenile court to terminate the parent-child legal relationship of the other parent,

13

unless the other parent's relationship to the child has previously been terminated or determined by a court not to exist." § 19-5-105(1).[3]

¶30   As the foregoing statutory provisions demonstrate, Article 5 envisions an expedited termination and adoption process that lacks many of the substantive and procedural safeguards of Article 3. Moreover, Article 5 appears to be premised on a number of important factual predicates, all of which justify the speedy process for termination and adoption that the Article envisions.

¶31   First, Article 5 appears to presume that the child to be relinquished has not been adjudicated dependent or neglected as to either parent. Cf. T.D., 140 P.3d at 217 ("[P]roceedings under article 5 of the Code . . . generally do not involve a situation where the child is exposed to an injurious environment."). Thus, Article 5 presumes that a fit parent has made the decision to relinquish the child and that this decision was in the child's best interests. See Troxel v. Granville, 530 U.S. 57, 68 (2000) (noting that courts must presume that fit parents act in the best interests of their children); Parham v. J.R., 442 U.S. 584, 602 (1979) ("The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and

---

[3] We note that it is not clear that the General Assembly intended this provision to apply in cases like this one, where both parents of the children are known. The General Assembly modeled section 19-5-105 on the 1973 Uniform Parentage Act. See Unif. Parentage Act § 25, 9B U.L.A. 499–501 (1973). The comment to the provision at issue notes that the pertinent subsection "deals with the case in which the father has not been formally ascertained and the mother seeks to surrender the child for adoption. In the light of [certain cited] U.S. Supreme Court[] decisions . . . and related state court decisions, it is considered essential that the unknown or unascertained father's potential rights be terminated formally in order to safeguard the subsequent adoption." Id.

14

capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children."). Once a court finds that a child is dependent or neglected, however, "the presumption that the parent is acting and will act in the best interests of the child has been overcome." People ex rel. N.G., 2012 COA 131, ¶ 31, 303 P.3d 1207, 1215. Accordingly, after an adjudication has entered, we can no longer presume that a parent who seeks to relinquish his or her child is acting in the best interests of the child, and therefore, Article 5's expedited procedures no longer provide an apt means for terminating a parent's parental rights.

¶32 Second, Article 5 seems to presume the absence of a pending termination proceeding. As noted above, section 19-5-105(1) requires the filing of a termination motion upon one parent's relinquishment of or proposal to relinquish parental rights. But when, as here, the State or guardian ad litem has already commenced a termination proceeding, it is difficult to discern a purpose to be served by the filing of a second, duplicative petition to terminate.

¶33 For all of these reasons, we conclude that in cases like the present one, Article 3 and Article 5 conflict.

¶34 Against this backdrop, we turn to the question presented in this case, that is, whether the Department may proceed to terminate parental rights under Article 5 when the children at issue have already been adjudicated dependent or neglected and a termination petition is pending in an Article 3 proceeding.

15

## C. The Department's Article 5 Termination Motion

¶35     The Department and the guardian ad litem make a number of arguments in support of their position that they could terminate Father's parental rights in this case under Article 5. For several reasons, we are unpersuaded.

¶36     First, the Department's and the guardian ad litem's interpretation of the Code would allow them to evade the detailed procedures governing dependency and neglect proceedings that the legislature has created. As noted above, shortly after the guardian ad litem filed the Article 3 termination motion, Mother stated that she did not wish to contest that motion. It was only after Mother did so that she filed a petition for relinquishment and the Department filed a motion to terminate Father's rights under Article 5, leaving the pending Article 3 termination motion inactive. Although we can appreciate why mother would wish to relinquish her parental rights rather than having those rights terminated, we perceive no basis for allowing the Department, at that point, to choose to proceed under Article 5's more expedited and streamlined termination and adoption procedures with respect to Father. To the contrary, permitting the Department to do so would allow it to evade Article 3's detailed procedures and the substantial burden of proof that the legislature has imposed on the State for terminating parental rights in a dependency and neglect proceeding. See In re R.A.M. 2014 COA 68, ¶¶ 40–41, 411 P.3d 814, 821 (noting that in a dependency and neglect proceeding, there are "eleven separate procedural protections for parents including the right to notice of the allegations supporting the termination motion, the right to cross-examine witnesses,

16

and the statutory right to counsel," whereas "[a] relinquishment involves only three procedural safeguards: the right to notice of the proceeding, the right to appear and contest the proceeding at a hearing, and the court's application of a clear and convincing burden of proof"). We cannot agree that the legislature intended such a result.

¶37 Second, although section 19-5-105(1) provides that upon relinquishment, the department <u>shall</u> file a petition to terminate, as noted above, this provision seems to presume that a termination motion is not already pending. We must read the provisions of a statutory scheme in harmony. <u>U.M.B. Bank</u>, ¶ 22, 408 P.3d at 840. Reading the pertinent provisions as the Department suggests, at least when a dependency and neglect proceeding under Article 3 is already pending, could result in parallel termination proceedings with different procedural requirements. <u>Compare</u> § 19-3-602, <u>and</u> § 19-3-604, <u>with</u> § 19-5-105. Such a construction would conflict with the settled principle that "[w]e favor interpretations that produce a harmonious reading of the statutory scheme and eschew constructions that create inconsistency." <u>A.M.</u>, ¶ 8, 296 P.3d at 1030. Accordingly, although section 19-5-105 uses the word "shall," we conclude that the General Assembly did not intend to mandate the filing of an Article 5 termination petition while an Article 3 termination petition was already pending in an existing dependency and neglect proceeding.

¶38 Finally, we note that our conclusion is fully supported by the numerous statutory provisions and procedural rules that express a preference for addressing issues relating

17

to a child's status under the provisions of Article 3, at least when a dependency and neglect proceeding is already pending. For example, as the division observed, the Code provides that the juvenile court shall have exclusive original jurisdiction in proceedings concerning any child who is neglected or dependent. § 19-1-104(1)(b). Similarly, the juvenile court retains jurisdiction over any child adjudicated as neglected or dependent until the child turns twenty-one, absent a court order terminating jurisdiction. § 19-3-205(1), C.R.S. (2017). And the Code and associated rules provide that if a petition involving the same child is pending in juvenile court or if continuing jurisdiction has been previously acquired by the juvenile court, then the district court shall certify the question of legal custody to the juvenile court. See § 19-1-104(4)(a), C.R.S. (2017); see also § 19-1-104(5), C.R.S. (2017) ("Where a custody award or an order allocating parental responsibilities with respect to a child has been made in a district court in a dissolution of marriage action or another proceeding and the jurisdiction of the district court in the case is continuing, the juvenile court may take jurisdiction in a case involving the same child if he or she comes within the jurisdiction of the juvenile court."); C.R.J.P. 4.4(a) ("Any party to a dependency or neglect action who becomes aware of any other proceeding in which the custody of a subject child is at issue shall file in such other proceeding a notice that an action is pending in juvenile court together with a request that such other court certify the issue of legal custody to the juvenile court pursuant to Section 19-1-104(4) and (5), C.R.S."). In our view, these statutes and rules amply

18

demonstrate the legislature's preference for deciding the fate of parents who are involved in dependency and neglect proceedings under Article 3.

¶39 For all of these reasons, we conclude that the Department could not properly avoid the pending dependency and neglect action (and the termination petition filed therein) by attempting to proceed by way of a relinquishment and termination under Article 5. Once the State commences a proceeding under Article 3, the parents are entitled to all of the substantive and procedural protections provided therein, and their parental rights can only be terminated in accordance with those procedures.

¶40 We therefore affirm the division's judgment and need not address the parties' remaining arguments regarding the jurisdiction of the juvenile court.

## III. Conclusion

¶41 For these reasons, we conclude that when a dependency and neglect proceeding is pending, the State can terminate parental rights only through the procedures set forth in Article 3 of the Code and cannot use the more limited processes provided in Article 5. Accordingly, we affirm the division's judgment and remand this case for further proceedings consistent with this opinion.

**JUSTICE BOATRIGHT** dissents, and **JUSTICE COATS** joins in the dissent.

19

JUSTICE BOATRIGHT, dissenting.

¶42     The majority, in an attempt to harmonize two statutes, holds that when a dependency and neglect proceeding is ongoing, the state cannot utilize Article 5 procedures to terminate parental rights.  In so doing, the majority perceives a conflict from the fact that Article 3 and Article 5 were enacted to address different factual scenarios and have different procedural requirements.  I recognize these differences.  But these differences do not create a conflict.

¶43     Article 5 applies when one parent relinquishes his or her parental rights, as the mother did here.  In that instance, the state "shall file a petition in the juvenile court to terminate the parent-child legal relationship of the other parent."  § 19-5-105(1), C.R.S. (2017).  Article 3 applies when a child has been adjudicated dependent and neglected, as also happened here, and the department submits a motion alleging the proper factual grounds for termination.  § 19-3-602(1), C.R.S. (2017).  As this case demonstrates, the factual scenarios these articles were intended to address may overlap.  When that occurs, the articles merely provide different procedures for termination.  They do not, however, require opposite outcomes.  Hence, the statutes do not conflict.  Accordingly, harmonizing the two statutes is not only unnecessary but also contrary to our statutory interpretation framework.  I would instead follow the plain language of Article 5, which permits a termination proceeding under the facts of this case.  For these reasons, I respectfully dissent.

1

¶44 When interpreting statutes, "We first look to the language of the statute, giving effect to the plain and ordinary meaning of words and phrases selected by the General Assembly. If statutory language is unambiguous, we apply it as written without resorting to other rules of statutory construction." A.M. v. A.C., 2013 CO 16, ¶ 8, 296 P.3d 1026, 1030 (citations omitted). If the plain language of two statutes conflicts, we harmonize the statutes, if possible. See People v. Steen, 2014 CO 9, ¶ 9, 318 P.3d 487, 490. Courts have found conflicts when statutes state opposite outcomes or prescribe potentially different consequences. See City of Florence v. Pepper, 145 P.3d 654, 657 (Colo. 2006) (finding two statutes "plainly in conflict" when one required the city to bestow workers' compensation benefits on employees and one permitted benefits at the city's discretion); Ortega v. Indus. Comm'n, 682 P.2d 511, 512 (Colo. App. 1984) (finding two statutory subsections in conflict when one permitted unemployment benefits when an employee quit for personal reasons and another denied benefits when an employee quit for personal reasons). Following this framework, I first look to the plain language of section 19-5-105, and I then address whether that plain language conflicts with section 19-3-602 such that harmonizing is necessary.

¶45 Section 19-5-105(1) states that when one parent relinquishes parental rights, as the mother did here, the Department "shall file a petition in the juvenile court to terminate the parent-child legal relationship of the other parent."[1] There is no language

---

[1] While the statute requires the Department to file a termination petition after relinquishment, the proceeding will not necessarily result in termination. The goal is to identify the child's permanent home. The court undertakes a detailed inquiry to

2

that even hints that the statute does not apply if an open dependency and neglect case is pending. Thus, when one parent relinquishes parental rights, even if a dependency and neglect case is pending, the plain language of section 19-5-105(1) requires the Department to file a termination petition. There is no justifiable reason to veer from this plain language unless that provision conflicts with another statute.

¶46 So the question is whether there is a conflict between section 19-5-105, the relinquishment statute, and section 19-3-602, the dependency and neglect statute, that requires harmonization. In my view, the statutes merely provide for alternative procedures to consider termination. That does not equate to a conflict.

¶47 Nevertheless, the majority insists that the two relevant statutes conflict and should be harmonized. See maj. op. ¶ 37. In particular, the majority notes that the purpose and procedure of the two statutes are different, which could lead to parallel proceedings with different procedural requirements. See id. Because of this, the majority reads the "shall file a motion to terminate" language in section 19-5-105(1) to "presume that a termination motion is not already pending," id., a qualification that appears nowhere in the statute or elsewhere in Article 5. This presumption is faulty. The majority does not demonstrate that there is a conflict between the two statutes justifying the presumption's creation, as illustrated by my discussion of each of the majority's points below.

_____

identify the other parent and provide him or her the opportunity to be heard; it then determines whether termination, or some other resolution, is appropriate. See § 19-5-105(2)–(4).

3

¶48 The majority first identifies the unique purposes of Article 3 and Article 5. Article 3, it recognizes, addresses issues with dependent and neglected children. Maj. op. ¶ 16. Article 5 focuses on adoption. Id. at ¶ 17. True enough, but the purpose of the two articles is irrelevant to determining if a conflict exists. Differing purposes do not erase or supersede the plain language in Article 5 permitting termination under certain circumstances. Nor do they create conflict when the plain language reveals none.

¶49 The majority then considers the heightened protections available to a parent under an Article 3 termination proceeding as opposed to under Article 5. See id. at ¶¶ 19–32. Proceeding under Article 5, the majority asserts, would allow the Department to evade the detailed and heightened procedures for termination outlined in a dependency and neglect case without a proper basis. Id. at ¶ 36. But there is a proper basis: The plain language of section 19-5-105(1) authorizes that procedure.

¶50 Despite the majority's apparent issues with the procedure provided under Article 5, it does not hold that termination under section 19-5-105(1) is an unconstitutional violation of due process—an argument the respondent father here makes. Instead, it appears the majority would simply prefer termination proceedings to proceed under Article 3. A court, however, may not prefer one statutorily authorized procedure over another. Our preferences do not matter. That is the legislature's prerogative.

4

¶51 Finally, the majority claims that following the plain language of section 19-5-105(1) could result in parallel termination proceedings with different procedural requirements. Id. at ¶ 37. Apparently, in the majority's view, the very fact that there are alternative statutory avenues for termination creates a conflict. But the legislature is well within its authority to enact alternative procedures to adjudicate a motion for termination of parental rights.

¶52 At its core, the purpose of harmonizing is to ensure that a party does not end up with two conflicting orders. Notably, the majority does not state that would happen here. In fact, it could not happen. Under the facts of this case, both termination motions would be filed in the same jurisdiction. No judge would permit simultaneous termination hearings even if two separate motions were filed, let alone enter conflicting orders. The only issue would be deciding on which motion to proceed. That is what happened here; though two termination motions were filed, there were not simultaneous proceedings and only one order was entered. It would be the same for any case proceeding under these circumstances. Without demonstrating conflicting outcomes, the majority has not alleged a conflict justifying harmonization.

¶53 Contrast our situation with City of Florence v. Pepper. In that case, a volunteer reserve police officer sought workers' compensation benefits from the city for an injury he incurred on the job. 145 P.3d at 655. A statute governing workers' compensation claims gave municipalities the option to include volunteer reserve police officers under the definition of "employee" for workers' compensation purposes. Id. at 655–56.

5

Another statute required municipalities to provide such officers workers' compensation benefits. Id. at 656. We found these two statutes to be "plainly in conflict with one another" because one stated that volunteer reserve police officers were entitled to workers' compensation benefits and the other stated that the governing body had the option of bestowing those benefits. See id. at 657. These are opposite outcomes. That is a conflict. Thus, harmonizing was appropriate.[2]

¶54 The same is not true here. Section 19-5-105(1) states that the Department shall file a termination petition when one parent relinquishes rights. Section 19-3-602(1) states that following the adjudication of a child as dependent and neglected, the court shall consider termination of parental rights after the Department files a motion alleging the proper factual grounds. Unlike in Pepper, these two statutes do not demand different outcomes; they simply denote two separate ways the court may consider termination. So there is no conflict and therefore no reason to harmonize.

¶55 The plain language, purpose, procedure, and potential outcomes of these two statutes do not create a conflict—neither in theory nor in application. And without conflict, the majority has no justification to use the principles of harmony to justify veering from the plain language of section 19-5-105(1), which permits termination. Hence, there is no justification to prohibit the Department from proceeding with termination under Article 5 in this instance. Therefore, I cannot agree that father's termination proceeded in error. Because of this, I respectfully dissent.

---

[2] The court in Pepper ultimately found these two statutes were irreconcilable and that the earlier statute was repealed by implication. 145 P.3d at 661.

6

I am authorized to state that JUSTICE COATS joins in this dissent.