25CA1992 Peo in Interest of VD 05-07-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA1992
Arapahoe County District Court No. 23JV81
Honorable Bonnie McLean, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of V.D., a Child,

and Concerning T.L. and W.D.,

Appellants.

---

JUDGMENT AFFIRMED

Division A
Opinion by JUDGE BERNARD*
Román, C.J., and Ashby*, J., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 7, 2026

---

Ron Carl, County Attorney, Kiley Schaumleffel, Assistant County Attorney, Aurora, Colorado for Appellee

Sheena Knight, Guardian Ad Litem

Andrew A. Gargano, Office of Respondent Parents' Counsel, Denver, Colorado for Appellant T.L.

Harald Van Gaasbeek, Office of Respondent Parents' Counsel, Fort Collins, Colorado for Appellant W.D.

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1     This is a dependency and neglect case.  A mother, T.L., and a father, W.D., appeal the judgment terminating their parent-child legal relationships with the child, V.D..  We affirm.

## I.     Background

¶ 2     After receiving a referral stating the child had been exposed to controlled substances before it was born, a caseworker spoke with hospital personnel.  They said mother and father tried to deny the child necessary medical care and they posed a "flight risk."

¶ 3     Because mother and father lived in Arapahoe County, the Arapahoe County Department of Human Services filed a petition in dependency or neglect.  The juvenile court, at the department's request, temporarily placed the child in the department's custody for placement with a foster family.

¶ 4     The court adjudicated the child to be dependent and neglected after mother's admission and father's failure to appear.  It then adopted treatment plans for both parents requiring them to (1) cooperate with the department; (2) establish consistent legal income; (3) obtain and maintain safe and adequate housing for the child; (4) complete substance use evaluations and follow any

1

recommendations; (5) demonstrate a lifestyle free of illegal activity; and (6) consistently attend family time.

¶ 5 Two years after the case began, the department asked the court to terminate mother's and father's parental rights. The court did so.

## II. Colorado Indian Child Welfare Act

¶ 6 Mother asserts the court did not comply with the Colorado Indian Child Welfare Act (CICWA), §§ 19-1.2-101 to -132, C.R.S. 2025. Specifically, she contends the court erred by terminating her parental rights before the department had "exhaust[ed] efforts" to enroll the child into the Cherokee Nation. We disagree.

### A. Applicable Law and Standard of Review

¶ 7 The federal Indian Child Welfare Act (ICWA) establishes "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902. For ICWA to apply in a dependency or neglect case, it must involve an Indian child. *See People in Interest of A.G.-G.*, 899 P.2d 319, 321 (Colo. App. 1995). "Indian child" is defined as "any unmarried person who is under age eighteen" and is

2

either (a) "a member of an Indian tribe," or (b) "eligible for membership in an Indian tribe" and "the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4); § 19-1.2-103(10), C.R.S. 2025.

¶ 8 Before August 6, 2025, "neither federal nor state law impose[d] on the Department any obligation to assist in enrolling eligible children in a tribal nation." *People in Interest of K.C. v. K.C.*, 2021 CO 33, ¶ 39. But, effective August 6, 2025, the General Assembly enacted CICWA to "ensure consistent and reliable compliance with the federal ICWA for the protection of Indian children within Colorado and to ensure that Indian children in this state are protected." § 19-1.2-102(2)(a)(II), C.R.S. 2025. CICWA not only codified the ICWA into Colorado law, but it also "provide[s] additional protections for Indian children." § 19-1.2-102(3). As is relevant to our analysis, section 19-1.2-109(1), C.R.S. 2025, requires a department to "assist in enrolling an Indian child . . . in a tribe with which the child is eligible for enrollment."

¶ 9 Whether ICWA applies to a proceeding, and whether a court correctly applied a legal standard to the particular facts of a case, are questions of law we review de novo. *People in Interest of M.V.*,

3

2018 COA 163, ¶ 32, *overruled on other grounds by People in Interest of E.A.M. v. D.R.M.*, 2022 CO 42, ¶ 56 n.10; *M.A.W. v. People in Interest of A.L.W.*, 2020 CO 11, ¶ 31.

¶ 10 Statutory interpretation is also an issue of law we review de novo. *People in Interest of L.M.*, 2018 CO 34, ¶ 13. When interpreting a statute, we consider the entire statute to give "consistent, harmonious, and sensible effect to all of its parts." *K.C.*, ¶ 21. We interpret words and phrases "in accordance with their plain and ordinary meanings." *Id.* And, if the language is unambiguous, we do not resort to other rules of statutory construction. *Foiles v. Whittman*, 233 P.3d 697, 699 (Colo. 2010).

### B. Additional Background

¶ 11 At the shelter hearing in March 2023, father claimed he had Cherokee heritage through his father's side of his family. Two months later, the department sent notice to the three federally recognized Cherokee tribes. Two of the tribes replied the child was not an Indian child and she was not registered or eligible to register as a member of the tribe. But the Cherokee Nation responded, although the child did not meet the definition of an Indian child as

of the time of the inquiry, she nonetheless qualified for enrollment in the tribe.

### C. Analysis

¶ 12 We conclude, for the following reasons, the court complied with CICWA.

¶ 13 To begin, mother incorrectly asserts the department had a duty to assist with enrolling the child in the Cherokee Nation. Recall that, before August 6, 2025, departments had no duty to assist with enrolling children as members of tribes. *See K.C.*, ¶ 39.

¶ 14 Even after August 6, 2025, departments only had a duty to assist in enrolling *Indian* children. *See* § 19-1.2-109(1). In that regard, neither father nor the record suggests the child is an Indian child as defined by CICWA. Neither parent asserted the child is a member of any tribe. *See* § 19-1.2-103(10)(a). And, since neither parent is a member of a tribe, even though the child is eligible for membership with the Cherokee Nation, she could not be the "biological child of a member of an Indian tribe." *See* § 19-1.2-103(10)(b).

¶ 15 The department therefore did not have a duty to assist with the child's tribal enrollment. Concluding otherwise would be

contrary to the plain language of the statute. *See K.C.*, ¶ 21 ("[W]e strive to avoid statutory constructions that either render words or provisions superfluous or ineffective or that lead to absurd results."). (We recognize, in some cases, assisting a child to enroll in a tribe may be "the best practice." *See id.* at ¶ 53.)

¶ 16    Because the department argued CICWA required it to assist in enrolling the child in a tribe, mother cites the invited error doctrine to contend the department "must abide the consequences of [its] acts." *People v. Rediger*, 2018 CO 32, ¶ 34.

¶ 17    But mother's reliance on the invited error doctrine is misplaced. "The invited error doctrine applies when a party invites or injects an error in the proceedings and later claims that the error should be a basis for reversal on appeal." *People in Interest of S.N-V.*, 300 P.3d 911, 916 (Colo. App. 2011). Contrary to mother's position, the department is not using its prior statement about CICWA and enrolling children in tribes to justify *reversing* the court's order or to claim the court's application of section 19-1.2-109 was error. Rather, the department asks us to *affirm* the court's order.

¶ 18 Even assuming, without deciding, the department was required to assist with enrolling the child in the tribe, the court concluded, with support in the record, the department made efforts to enroll the child in the Cherokee Nation:

- The caseworker called the Cherokee Nation several times but did not reach anyone.

- The caseworker tried to complete an enrollment application, but she did not have the paternal great-grandfather's death certificate, which was necessary to submit the application.

- The caseworker requested the death certificate from Oklahoma six days after CICWA took effect. (Mother's submission that the caseworker asked the tribe rather than the State for the death certificate is contradicted by the record.)

- Once she received the death certificate, she planned to contact the Cherokee Nation to help her submit the enrollment application.

¶ 19 Mother asserts the court erred by (1) finding the department complied with the statute when it had not "exhaust[ed]" efforts to

enroll the child or proceed with diligence and care; and (2) terminating her parental rights before the child was enrolled in the Cherokee Nation. But the statute does not require a department to exhaust all efforts or succeed in enrolling a child before a court may terminate parental rights. *See* § 19-1.2-109(1) (requiring a department to "assist in enrolling an *Indian* child") (emphasis added); § 19-1.2-125, C.R.S. 2025 (identifying the findings a juvenile court must make under CICWA before terminating parental rights, which does not include enrollment findings).

¶ 20 The General Assembly could have required a department to exhaust all efforts to enroll an Indian child in a tribe or conditioned termination on a child's enrollment, but it did not. *See Springer v. City & County of Denver,* 13 P.3d 794, 804 (Colo. 2000) ("Where the legislature could have chosen to restrict the application of a statute, but chose not to, we do not read additional restrictions into the statute."). It is also unclear what additional efforts mother expected the department to make to enroll the child before receiving the required death certificate.

### III. Continuance

¶ 21    Mother contends the court erred when it denied her request to continue the termination hearing. We disagree.

#### A. Applicable Law and Standard of Review

¶ 22    At a minimum, a parent must be given adequate notice of the proceedings and an opportunity to protect her rights. *People in Interest of J.A.S.*, 160 P.3d 257, 262 (Colo. App. 2007). "[I]n assessing fairness, 'the trial court [must] give primary consideration to the child's physical, mental, and emotional needs.'" *People in Interest of L.S.*, 2023 CO 3M, ¶ 30 (quoting *A.M.*, ¶ 20). A parent must establish "actual prejudice resulting from the juvenile court's denial of [a] requested continuance" to succeed on a due process claim. *People in Interest of E.B.*, 2022 CO 55, ¶ 22.

¶ 23    The Colorado Children's Code directs courts to "proceed with all possible speed to a legal determination that will serve the best interests of the child." § 19-1-102(1)(c), C.R.S. 2025. When ruling on a motion to continue, a juvenile court "should balance the need for orderly and expeditious administration of justice against the facts underlying the motion and the child's need for permanency." *People in Interest of R.J.B.*, 2021 COA 4, ¶ 11.

¶ 24    In an expedited permanency planning case, such as this one, in which a child is under six years of age when the petition is filed, a juvenile court cannot grant a continuance unless the moving party establishes good cause for the continuance and the continuance will serve the child's best interests. § 19-3-104, C.R.S. 2025. If a court grants a continuance under this section, it must reschedule the case within thirty days. *Id.*

¶ 25    We review the denial of a motion to continue a hearing for an abuse of discretion. *R.J.B.*, ¶ 13. A court abuses its discretion "when its decision is manifestly arbitrary, unreasonable, or unfair, or when it misapplies or misconstrues the law." *E.B.*, ¶ 14. We review the underlying procedural due process claims de novo. *R.J.B.*, ¶ 26.

### B.    Analysis

¶ 26    The record in this case shows that mother was arrested in Texas about six months before the termination hearing. She was transported to Colorado, where she was imprisoned. She was paroled on the morning of the termination hearing. Her attorney asked the court to continue the termination hearing so mother

could work on the conditions of her parole and reunify with the child.

¶ 27 The court denied the request. The court said there was not good cause to continue the hearing, noting this case had been open for two-and-a-half years.

¶ 28 We conclude mother has not shown the court abused its discretion. *See id.* at ¶ 13. The court properly weighed the need for orderly and expeditious administration of justice against the reasons underlying the motion. *See id.* at ¶ 11.

¶ 29 Mother did not explain why a continuance was in the child's best interests. *See* § 19-3-104. The case had been open for two-and-a-half years, mother had made minimal progress on her treatment plan during that time, and the child had substantial needs. Since the court could only continue the hearing for thirty days, and since nothing in the record suggests, even if mother immediately began to comply with all aspects of her treatment plan, she could become fit within that time, we conclude the record supports the court's ruling. *See id.*

¶ 30 To the extent mother asserts her due process rights were violated, we disagree. Generally, "due process requires the state to

11

provide fundamentally fair procedures to a parent facing termination," which include (1) notice of the hearing; (2) advice of counsel; and (3) the opportunity to be heard and defend. *R.J.B.*, ¶ 27. In this case, the record shows mother received these three things.

¶ 31 Also, mother does not tell us what other evidence she would have presented had the court continued the hearing. We therefore "are unable to discern that the [hearing was] affected in any appreciable way" by the denial of her request for a continuance. *People in Interest of C.G.*, 885 P.2d 355, 358 (Colo. App. 1994). Because mother has not shown she was prejudiced by the court's decision to deny her request for a continuance, we conclude she has not established a violation of her due process rights. *E.B.*, ¶ 22.

## IV. Issues Concerning the Court's Decision to Terminate Mother's and Father's Parental Rights

### A. General Principles: Termination Criteria and Standard of Review

¶ 32 A juvenile court may terminate parental rights if it finds, by clear and convincing evidence, (1) the child was adjudicated dependent or neglected; (2) the parent has not complied with an

12

appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change in a reasonable time. § 19-3-604(1)(c), C.R.S. 2025.

¶ 33    Whether the juvenile court properly terminated parental rights is a mixed question of fact and law. *A.M.*, ¶ 15; *see also People in Interest of A.S.L.*, 2022 COA 146, ¶ 8 (applying the same standard of review to whether a department of human services satisfied its obligation to make reasonable efforts). We review the court's factual findings for clear error, but we review de novo its legal conclusion based on those facts. *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10.

## B. Reasonable Efforts

¶ 34    Mother asserts the juvenile court erred by finding the department made reasonable efforts to rehabilitate her. We disagree.

## 1. Applicable Law

¶ 35    Before a juvenile court may terminate parental rights under section 19-3-604(1)(c), the department must make reasonable efforts to rehabilitate the parent and reunite the family. §§ 19-1-

13

103(114), 19-3-100.5(1), 19-3-208, 19-3-604(2)(h), C.R.S. 2025. Reasonable efforts means the "exercise of diligence and care" for children who are in out-of-home placement.  § 19-3-103(114).

¶ 36     Appropriate services provided in accordance with section 19-3-208 satisfy the reasonable efforts standard.  § 19-1-103(114). Among the services required under section 19-3-208 are screenings, assessments, and individual case plans for the provision of services; home-based family and crisis counseling; information and referral services to available public and private assistance resources; family time services; and placement services.  § 19-3-208(2)(b).

¶ 37     In assessing a department's efforts, the juvenile court should consider whether the services provided were appropriate to support the parent's treatment plan, *S.N-V.*, 300 P.3d at 915, by "considering the totality of the circumstances and accounting for all services and resources provided to a parent to ensure the completion of the entire treatment plan," *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 33.  But the parent is ultimately responsible for using those services to comply with their treatment plan.  *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011).

## 2. Preservation

¶ 38　　The department and the child's guardian ad litem contend mother did not adequately preserve her reasonable efforts challenge and, therefore, we should not consider it.  But we need not decide this issue because, even if we assume mother preserved her claim, we conclude the court did not err when it decided the department made reasonable efforts to rehabilitate her and those efforts were ultimately unsuccessful.  *See L & R Expl. Venture v. Grynberg*, 271 P.3d 530, 536 (Colo. App. 2011) (declining to resolve an issue where the outcome would not change).

## 3. Analysis

¶ 39　　The court found mother had numerous opportunities to engage in treatment, work with the department, and comply with her treatment plan, but she did not ameliorate the concerns initially leading to the department's involvement.  We conclude the record supports these findings.

¶ 40　　The caseworker testified mother had inpatient substance abuse treatment available to her at times throughout the case, but she did not engage in the treatment even though a coordinator offered to take her to the treatment facility.  *See J.C.R.*, 259 P.3d at

15

1285. The department also gave mother bus passes and family time throughout the case.

¶ 41 Even so, mother asserts the department's efforts were insufficient because it did not assist her with housing or provide her with referrals for service providers during her time in Texas. When the case began, the record shows mother was working with different resources to get a housing voucher. A few months later, the caseworker tried to meet with mother to assess her housing needs but could not reach her.

¶ 42 A short time after that, mother was arrested, and she was incarcerated for about three months. Upon her release, she lived with her sister until she left for Texas, where she reported having more support while living with a friend. About ten months later, mother was rearrested and remained incarcerated until the termination hearing.

¶ 43 In other words, for most of the case mother either had access to housing resources, lived with family or friends, or was incarcerated. *See* § 19-3-208(2)(b) (requiring referrals to public and private assistance resources only if they are determined to be necessary and appropriate). Additionally, after mother went to

16

Texas, the record shows she was provided with the names of treatment providers in her area. She said she found a treatment facility.

### C. Fit Within a Reasonable Time

¶ 44 Mother asserts the court erred when it found she could not become a fit parent within a reasonable time because, in her view, she made substantial progress in her treatment plan objectives. We disagree, and we conclude, for the following reasons, the court did not err when it decided mother could not become a fit parent within a reasonable time.

### 1. Applicable Law

¶ 45 An unfit parent is one whose conduct or condition renders her unable to give a child reasonable parental care. *People in Interest of D.P.*, 160 P.3d 351, 353 (Colo. App. 2007). At a minimum, reasonable parental care requires the parent to provide nurturing and safe parenting adequate to meet the child's physical, emotional, and mental health needs. *People in Interest of A.J.*, 143 P.3d 1143, 1152 (Colo. App. 2006).

¶ 46 In determining whether a parent's conduct or condition is likely to change within a reasonable time, "the court may consider

17

whether any change has occurred during the proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition." *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 24. What constitutes a reasonable time is fact specific and must be determined by considering the physical, mental, and emotional conditions and needs of each child. *Id.* at ¶ 25. A "reasonable time" is not an indefinite time. *Id.* When, as here, the action is subject to the statutory expedited permanency planning provisions, the court must consider the child's need to be placed in a permanent home as expeditiously as possible. §§ 19-1-102(1.6), 19-1-123, C.R.S. 2025.

### 2. Analysis

¶ 47 The court decided mother was unfit, she had only minimally complied with her treatment plan, she exhibited the same problems addressed in her treatment plan without adequate improvement, and she was unlikely to become fit within a reasonable time.

¶ 48 To buttress these findings, the court noted, during the two-and-one-half years the case had been pending, mother had not secured stable housing, had not complied with substance abuse treatment, and had not consistently attended family time meetings.

Then, focusing on the child, the court considered her special needs, determining she needed immediate stability and permanency.

¶ 49    The record supports these findings even though, as mother points out, she engaged in substance use treatment and completed classes regarding substance abuse, anger management, life skills, and parenting during her incarceration.  According to the caseworker:

- The department was still concerned about mother's substance abuse because she had not shown sobriety outside of a controlled environment.

- Mother had not shown she could obtain and maintain safe and appropriate housing.

- Despite the treatment mother had received, she still demonstrated the problems that originally led to the treatment plan.

- Mother was unlikely to become a fit parent within a reasonable time.

¶ 50    The caseworker added the child had substantial needs, and she needed to be in a permanent and stable situation as soon as possible.  The caseworker therefore did not think it was in the

child's best interest to give mother more time to show she could comply with the treatment plan. *See S.Z.S.*, ¶ 25.

¶ 51 Mother maintains that she "made substantial progress and had a clear path to success set before her that would allow her to become stable in two to six months." But it was for the court to consider and weigh the evidence and resolve any evidentiary conflicts. *See People in Interest of A.J.L.*, 243 P.3d 244, 250 (Colo. 2010) ("[I]t is important to defer to the [juvenile] court, particularly when it hears contradictory testimony on material issues . . . ."). Mother's contention essentially asks us to reweigh the evidence or to substitute our judgment for the court's, neither of which we can do. *See S.Z.S.*, ¶ 29.

## D. Less Drastic Alternatives

¶ 52 Mother and father both contend the court erred by finding there were no less drastic alternatives to termination. We are not persuaded. We conclude, rather, the record supports the court's finding there was no less drastic alternative in the child's best interests, so we will not disturb that finding.

## 1. Applicable Law and Standard of Review

¶ 53    Before terminating parental rights under section 19-3-604(1)(c), the juvenile court must consider and eliminate less drastic alternatives. *People in Interest of M.M.*, 726 P.2d 1108, 1122 (Colo. 1986). In considering less drastic alternatives, a court must give primary consideration to the child's physical, mental, and emotional conditions and needs. § 19-3-604(3); *People in Interest of D.B-J.*, 89 P.3d 530, 531 (Colo. App. 2004). A court may also consider, among other things, (1) whether an ongoing relationship with a parent would be beneficial to the child, *People in Interest of A.R.*, 2012 COA 195M, ¶ 38; (2) whether the child is bonded with the parent, *see People in Interest of N.D.V.*, 224 P.3d 410, 421 (Colo. App. 2009); and (3) whether an allocation of parental responsibilities (APR) provides adequate permanence and stability for the child, *People in Interest of T.E.M.*, 124 P.3d 905, 910 (Colo. App. 2005).

¶ 54    For a less drastic alternative to be viable, it must do more than adequately meet a child's needs; rather, it must be in the child's best interests. *A.M.*, ¶ 27. If, therefore, the juvenile court considers a less drastic alternative but instead finds termination is in the

21

child's best interests, it must reject the less drastic alternative and order termination. *Id.* at ¶ 32.

¶ 55    "We review a juvenile court's less drastic alternatives findings for clear error." *People in Interest of E.W.*, 2022 COA 12, ¶ 34. So, when a juvenile court considers less drastic alternatives but instead finds termination is in the child's best interests, we are bound to affirm the decision if the record supports the court's findings. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

## 2. Analysis

¶ 56    The court found termination was in the child's best interests and there was no less drastic alternative that would meet the child's physical, emotional, and mental health needs. While making these findings, the court focused on (1) the child's "very serious" and "significant" mental, physical, and emotional needs; (2) the child's age; (3) the length of the case and the child's out-of-home placement; and (4) the child's overall need for permanency and stability.

¶ 57    The record supports these findings. In addition to the child's special needs, the caseworker described the child's need for consistency, agreeing "any little change" adversely impacted her.

Given her special needs, the pressing need for permanency and stability, and mother's tendency to push boundaries, the caseworker thought termination and adoption was in the child's best interests. *See J.C.R.,* 259 P.3d at 1285 ("Permanent placement is not a viable less drastic alternative to termination if the children need a stable, permanent home that can only be assured by adoption.").

¶ 58 Mother and father assert the department did not make "ongoing and diligent efforts to explore relative placement options." Specifically, they assert the department did not explore maternal great-grandfather as a placement option beyond "a single text message." Mother adds the department did not (1) follow-up with maternal uncle after the denial of the Interstate Compact on the Placement of Children study of his home; (2) explore mother's sister as a placement option after January 2024; or (3) try to contact paternal grandfather or paternal great-grandmother after November 2024. (In support of these contentions, mother and father rely on evidence no one introduced into the record during the termination hearing. We do not consider evidence that "was not presented to the trial court." *In re Edilson,* 637 P.2d 362, 364 (Colo. 1981).)

¶ 59    The department is obligated to investigate a "reasonable number" of placement options. *D.B-J.*, 89 P.3d at 532. In this case, the caseworker (1) followed-up with maternal uncle after the home study, and he responded that he was no longer willing to be considered as a placement option; (2) requested necessary documentation to start the home study process for maternal great-grandfather, who did not respond; (3) spoke with paternal grandmother and maternal great-uncle, who were not able to be placement options; (4) spoke to maternal aunt in February 2024, who said she "needed to take a step back"; and (5) left a message for paternal grandfather in November 2024, who did not respond.

¶ 60    Neither mother nor father direct us to any authority requiring the department to repeatedly contact relatives who have already declined placement. Rather, mother relies on section 19-3-507(1)(d), C.R.S. 2025, which prohibits the court from denying placement with a relative on the sole basis that the relative previously declined consideration as a placement. But here, the court did not deny an allocation of parental rights to a family member who previously had withdrawn from placement consideration. The court found, instead, there was no alternative to

termination, including an allocation of parental rights. *See A.M.*, ¶ 32. Even if the department had engaged in a more diligent search for relatives, it would not change the court's ultimate finding that termination was the best option for the child. *See People in Interest of H.L.B.*, 2025 COA 86, ¶ 23 ("[W]hether a less drastic alternative is available is a distinct consideration from a court's later finding of whether that alternative is in the child's best interests.").

¶ 61 Mother and father next submit the court erred by finding an allocation of parental rights, in general, was not a viable less drastic alternative. In support, they focus on mother's positive visits with the child, mother's treatment plan progress, and testimony indicating contact between the child and the parents was in her best interests. Father adds the order lacked support because there was "[n]o evidence" continued contact with him would "disrupt the child's stability and permanency."

¶ 62 While it is true these are some of the factors the court may weigh when determining if a less drastic alternative is appropriate, *see A.R.*, ¶ 38, no single factor is dispositive. *Id.* (noting the court *may* consider "various factors"). And we cannot reweigh the evidence or substitute our judgment for the court's. *S.Z.S.*, ¶ 29.

E. Ineffective Assistance of Counsel

¶ 63     Father contends he received ineffective assistance of counsel because his counsel did not (1) request an amended treatment plan following his incarceration; and (2) advocate for the department to make reasonable efforts during his incarceration to render him a fit parent.  We disagree.

1. Applicable Law

¶ 64     A parent has a statutory right to effective counsel in dependency and neglect proceedings.  §§ 19-1-105(2), 19-3-202(1), C.R.S. 2025; *A.R. v. D.R.*, 2020 CO 10, ¶ 47.  A parent can raise a claim of ineffective assistance of counsel in a dependency and neglect proceeding for the first time on appeal.  *People in Interest of C.H.*, 166 P.3d 288, 291 (Colo. App. 2007).

¶ 65     We employ the same *Strickland* test that is used in criminal cases to evaluate ineffective assistance of counsel claims in dependency and neglect proceedings.  *A.R. v. D.R.*, ¶ 60 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)).  Under this test, to establish a claim, the parent must show (1) counsel's performance was outside the wide range of professionally competent assistance, and (2) the parent was prejudiced by counsel's deficient

26

performance — in other words, there is a reasonable probability, but for counsel's unprofessional errors, the outcome of the proceeding would have been different. *Id.* at ¶¶ 48, 60. "If the parent fails to establish either prong of this test, the claim fails." *People in Interest of C.B.*, 2019 COA 168, ¶ 26.

¶ 66 If the parent's allegations lack sufficient specificity, we may summarily deny the ineffective assistance claim. *See C.H.*, 166 P.3d at 291. In other words, a remand for an evidentiary hearing is only required if the parent's allegations are sufficiently specific and compelling to constitute a prima facie showing of ineffective assistance of counsel.

## 2. Additional Background

¶ 67 During the shelter hearing in March 2023, the court appointed counsel for father. Six months later, father's counsel moved to withdraw. Considering father's lack of involvement, the court granted counsel's motion. In January 2024, father was arrested and incarcerated until July 2024.

¶ 68 When father appeared at a permanency planning hearing in April 2024, the court reappointed his former counsel and directed father to communicate with his counsel. Six months later, father's

counsel again requested to withdraw.  The court granted this request.

¶ 69　After father's reincarceration in January 2025, the court again reappointed father's former counsel, and she remained his counsel through the termination hearing.  Father was transferred to a different incarceration facility in July 2025, and he remained incarcerated through the termination hearing.

### 3.  Appropriate Treatment Plan

¶ 70　Father asserts he received ineffective assistance from counsel because she did not request an amended treatment plan following his incarceration despite his inability to complete some of his treatment plan objectives — such as obtaining legal income, maintaining stable housing, and participating in substance use disorder treatment — while incarcerated.  We need not decide whether counsel's failure to make such a request amounted to deficient performance, because, even if it did, father has not shown, but for this failure, the result of the proceeding would have been different.  *See A.R. v. D.R.*, ¶ 60.

¶ 71　Father asserts that "[w]ith proper advocacy from his attorney, [he] would have been provided an appropriate treatment plan based

on his incarceration, would have received family time with his daughter, would have obtained relevant services and treatment to become a fit parent while incarcerated, and . . . was likely to become fit." But he does not explain how he could have addressed the safety concerns identified in this case, particularly the substance use concerns, without completing the action steps listed in his treatment plan. *See People in Interest of K.B.*, 2016 COA 21, ¶ 14 ("In determining whether a treatment plan is appropriate, the court must consider whether the plan's objectives adequately address the safety concerns identified during the assessment of the family."). Indeed, he does not explain how a treatment plan without legal income, stable housing, and substance use treatment, would have rendered him a *fit* parent in a reasonable time. Nor does he explain why, even if his incarceration served as a barrier for a portion of the case, his treatment plan was overall inappropriate considering he was out of custody for about half of the case.

¶ 72 Based on these factors, father's claim — with an appropriate treatment plan he was likely to become fit — is too speculative to establish prejudice. *See People v. Sherman,* 172 P.3d 911, 914

(Colo. App. 2006) (holding a speculative claim does not satisfy the prejudice prong of *Strickland*).

### 4. Reasonable Efforts

¶ 73    Father submits he received ineffective assistance because his counsel did not ask the court to order the department to make reasonable efforts while he was incarcerated to render him a fit parent.  He specifically points to departmental efforts concerning family time, services, and attendance at family engagement meetings.  But, even if we assume, without deciding, counsel's performance fell below the range of professionally competent assistance, father has not shown he was prejudiced by the putative error.

¶ 74    For example, father asserts he "never received the family time to which he was entitled" during his incarceration, which "led to the juvenile court's finding that [he] was inconsistent in his visitation and that there was a lack of attachment between [father] and the [child]."  But, in finding father's family time participation "very inconsistent," the court focused mainly on "the time that he was not in custody."  Indeed, the caseworker testified the department

continued to offer family time before father was incarcerated, but he had not seen the child for several months.

¶ 75    And, during father's incarceration, the caseworker reported the department worked to facilitate family time, but the facilities reported several barriers, including technology and staff limitations. Yet, despite these barriers, the department set up virtual family time, but father only attended two of the visits. After his transfer to another facility, approximately two months before the termination hearing, he requested the visits be put on hold.

¶ 76    Father also contends his counsel did not investigate the services and treatment available to him during his incarceration, which, father continues, "led to the juvenile court finding . . . that [father] did not reasonably comply with his treatment plan, and that [he] provided no evidence of any substance use disorder evaluation or treatment." But this contention overlooks (1) father's own statements to the caseworker reflecting his knowledge of services available to him during his incarceration; and (2) the approximately fifteen months when he was out of custody and did not complete a substance abuse evaluation or treatment.

¶ 77    Finally, father submits, without participating in family engagement meetings, he "could not adequately participate in the case, achieve the requirements of his treatment plan, []or understand the child's medical and emotional needs."  Aside from the family engagement meetings, however, the caseworker continued to meet with father during his incarceration, and they discussed, among other things, father's options, group and class attendance during his incarceration, and the child's progress.

¶ 78    In short, father's contentions do not specifically demonstrate prejudice, and, thus, he has not made a prima facie showing of ineffective assistance of counsel.  *A.R. v. D.R.*, ¶ 63 ("If the parent's allegations lack sufficient specificity, then the ineffective assistance of counsel claim may be summarily denied.").  Consequently, because father has not satisfied the second prong of the *Strickland* test, his claims must fail.  *See C.B.*, ¶ 26.

¶ 79    The judgment is affirmed.

CHIEF JUDGE ROMÁN and JUDGE ASHBY concur.